UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

PORTLAND DIVISION


ERICK T. MOORE,                                              Case No.: 09-CV-746-AC

                            Plaintiff,

                                                            AMENDED[1]
                                                            OPINION AND ORDER

              v.

JOHN E. POTTER, Postmaster General,

                            Defendant.

_____

ACOSTA, Magistrate Judge:

*Opinion*

      Erick T. Moore ("Moore"), a long-time employee of the United States Postal Service, filed

---

[1] The Opinion and Order is amended for the sole purpose of correcting an error at the end of the first paragraph, substituting "Potter's motion" for "Moore's motion."

this action against John E. Potter, Postmaster General of the United States Postal Service ("Potter"), asserting claims for race discrimination and retaliation under Title VII of the Civil Rights Act of 1964 (42 U.S.C. § 2000e, *et seq*.) (2007) ("Title VII"). Currently before the court is Potter's motion for summary judgment. The court finds that the evidence establishes that Moore did not "apply" for a promotion, was not subjected to a hostile environment, and is unable to establish a causal connection between his protected activity and the alleged retaliatory conduct of his supervisors. Accordingly, Potter's motion for summary judgment is granted.[2]

## Preliminary Procedural Matter

Moore opens his opposition brief with a six-page description of the history of discrimination by the Portland District of the United States Postal Service ("Post Office"), including summaries of allegedly discriminatory conduct against other African American employees and a description of past discriminatory actions taken against Moore. As factual support for this description, Moore relies, in part, on deposition transcripts and declarations offered in cases filed by other Post Office employees, as well as a case previously filed by Moore and dismissed at the summary judgment stage by Judge Brown. Moore also offers the deposition testimony of Luther Johnson, a Post Office employee, summarizing the difficulties Johnson endured in seeking a promotion to a permanent supervisory position which he attributes to his status as an African American. Potter argues this evidence is not relevant to the issues currently before the court, can not create a genuine issue of material fact, and should not be considered.

At the summary judgment stage, the court must look at the evidence presented to it by the

---

[2]The parties have consented to jurisdiction by magistrate judge in accordance with 28 U.S.C. § 626(c)(1).

parties and, initially, determine if there is a genuine issue of material fact. Evidence presented in support of or in opposition to a motion for summary judgment must be admissible under the Federal Rules of Evidence. FED. R. CIV. P. 56(e). Consequently, when determining whether a party is entitled to summary judgment, the court is limited to considering admissible evidence and must reject evidence that is irrelevant, speculative, ambiguous, argumentative, or constitutes a legal conclusion exclusively within the purview of the court's consideration. *See Burch v. Regents of Univ. of California*, 433 F. Supp. 2d 1110, 1119 (E.D. Cal 2006).

Rule 401 of the Federal Rule of Evidence defines "relevant evidence" as "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." FED. R. EVID. 401. Even relevant evidence may be excluded if its "probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by consideration of undue delay, waste of time, or needless presentation of cumulative evidence." FED R. EVID. 403.

In the context of an employment discrimination case in which the plaintiff offered testimony from other employees about discriminatory behavior engaged in by supervisors who played no part in the adverse employment action challenged by the plaintiff, the Supreme Court recently held that the application of a *per se* rule excluding such evidence by a trial court constitutes an abuse of discretion. *Sprint/United Mgmt. Co. v. Mendelsohn*, 522 U.S. 379, 387 (2008). The Court explained that:

> Relevance and prejudice under Rules 401 and 403 are determined in the context of the facts and arguments in a particular case, and thus are generally not amenable to broad *per se* rules. . . . . The question whether evidence of discrimination by other supervisors is relevant in an individual ADEA case is fact based and depends on many factors, including how closely related the evidence is to the plaintiff's

circumstances and theory of the case. Applying Rule 403 to determine if evidence
is prejudicial also requires a fact-intensive, context-specific inquiry.

*Id*. at 387-88. *Mendelsohn* makes clear that district courts faced with other-supervisor discrimination
evidence must in each instance consider the type of discrimination, the proximity of the
discrimination to the events of the case at hand, and the similarity – or lack thereof – between the
proffered evidence and the allegations under review.

Moore relies on the declaration of Charles Collins presented in *Henry v. Potter*, CV No. 09-
480-KI, currently before Judge King of this court, in which Collins states he observed race
discrimination to be a problem throughout his twenty-three years with the Post Office. (Collins.
Decl. ¶ 4.) Collins represented that he felt he was personally subjected to race discrimination when
he applied for the position of plant supervisor during the 1980's. (Collins Decl. ¶ 6.) He also
provided information about Henry's employment with the Post Office and a "roundtable" meeting
held in 2005 to address complaints of race discrimination at the Post Office, but did not discuss
Moore or his employment. (Collins Decl. ¶¶ 5, 7-9.) Moore also relies on the deposition transcript
and declaration of Harlan Henry offered in *Henry*. In his deposition, Henry testifies that "Mr.
Batchelor" targeted him for disciplinary action based on his race after Henry participated in the
roundtable meeting and complained about race discrimination at the Post Office. (Henry Dep. 102:6-
22.) In his declaration, Henry describes numerous incidents of workplace discrimination, both
against himself and another African American Post Office employees, and retaliatory acts taken
against Henry for his participation at the roundtable meeting and his filing of a formal complaint
against the Post Office. (Henry Decl. ¶¶ 3.) Finally, Moore offers the deposition transcript of Dallas
Keck taken in *Henry* as additional evidence that the roundtable meeting occurred and was held

primarily to address race discrimination complaints at the Post Office.

The issues in the current case are very limited, and this evidence does not survive scrutiny under *Mendelsohn* for relevance to those issues. First, Moore alleges that a number of his supervisors, namely Timothy Chamberlin, Supervisor of Distribution Operations; Reba Kersey, Supervisor of Distribution Operations; Terry K. Anderson, District Manager; and Jeani Goold, Manager of Distribution Operations,[3] discriminated against him based on his race, and retaliated against him for filing a formal complaint for race discrimination, by not allowing him to have personal items on the work room floor or talk to an African-American shop steward, and by denying him the opportunity to train for a supervisory position, all in July and August of 2008. (Compl. ¶¶ 7-8, 11, 18-19.) None of these supervisors were involved in the events giving rise to the testimony of Collins and Henry. Furthermore, the events themselves are far removed in time from Moore's circumstances here. With the exception of a few matters described by Henry in his declaration, the evidence offered in *Henry* and relied on by Moore in this case occurred well before the summer of 2008. None of the individuals involved in the discriminatory conduct alleged in *Henry* are involved in the matter currently before the court, and none of the deponents or declarants provided any information about Moore or the acts of discrimination alleged by him in his complaint. Finally, the documents relied on by Moore are fairly general in nature and, on occasion, do not make sense without reference to other documents filed in *Henry* which are not presently before this court. The court finds that the evidence from the *Henry* case is not relevant to the issues currently before it, and, accordingly, it will not be considered.

---

[3]In his memorandum in opposition to Moore's motion for summary judgment, Plaintiff identifies Robert McVicker as an individual with supervisory authority who also discriminated against him.

Moore similarly relies on the deposition transcript of Robert Warden, who was deposed for a case filed by Gayle Santoni, an ex-employee of the Post Office, against Potter for Title VII retaliation and violation of the Family and Medical Leave Act. *Santoni v. Potter*, CV No. 06-3038-CL. In his deposition, Warden testified that, in his experience, United States Post Office employees who file a complaint against a supervisory employee in the state of Oregon are generally considered troublemakers and are less likely to have a request for reassignment or promotion approved. (Warden Dep. 43:21-25, 44:20-46:3, 46:17-22.) Warden specifically identified Doug Bachelor and Dallas Keck as individuals who referred to individuals who file complaints as "frequent filers" and stated that both Bachelor and Keck "disfavored" such individuals and were a lot less willing to give them the benefit of the doubt or go the extra mile for them. (Warden Dep. 45:6-46:3.)

There is no indication that Warden is talking about the Post Office (*i.e.*, the Portland Division of the United States Postal Service) – his comments relate to employees within the state of Oregon, not necessarily the Portland Division. In fact, a review of the complaint filed by Santoni establishes that she worked in the Medford office of the United States Postal Service and that most of the conduct she complained of occurred in Medford, not Portland. As with the evidence from Henry, temporal proximity is lacking: there is no indication of what period of time Warden is testifying about. Further, neither Bachelor nor Keck are identified by Moore as individuals who engaged in discriminatory conduct against him. Finally, Warden does not testify about Moore or the alleged acts of discrimination against him. Again, the court finds that the testimony from the Warden deposition is not relevant to the issues currently before it.

Moore also relies on evidence submitted by him in his prior action filed in this court against Potter. *Moore v. Potter*, CV No. 08-1007-BR ("First Action"). In the First Action, Moore alleged

that Anthony Spina-Denson, Manager of Customer Services; Shelley Lifto, Supervisor of Customer Services; Karen L. Sharp, Human Resources Specialist; and Dallas Keck, District Manager, discriminated against him based on his race by harassing him and causing him to fail the Associate Supervisor's Training Program he began in January of 2007 (the "Program"), and retaliating against him for complaining about race discrimination. At the summary judgment stage, Judge Brown found that Moore was unable to state a *prima facie* case for harassment, discrimination, or retaliation and dismissed his complaint. Specifically, Judge Brown found that four comments made by Spina-Denson and Lifto between February 12, 2007, and March 30, 2007, did not rise to the level of creating an objectively hostile work environment based on Moore's race, noting that two of the statements were true, the comments were sporadic and isolated, and the comments were not racial in nature; that Moore failed to establish a causal relationship between his protected activity under Title VII and his removal from the Program; and that the Post Office had a legitimate, nondiscriminatory, and nonpretextual reason for removing Moore from the Program. (Lorenz Decl. Ex. E[4].) Judge Brown rejected evidence offered by Moore through the declaration of Harlan Henry that Spina-Denson discriminates against African Americans, explaining that Moore did not provide either specific or substantial evidence that the motivations of the individuals accused of discriminating against Moore, or their reasons for removing Moore from the Program, were discriminatory. (Lorenz Decl. Ex. E at 31.)

Moore relies on the deposition of Keck, the District Manager of the Post Office from January 2000 to September 2008, offered in the First Action. In the deposition, Keck recounts conversations

---

[4]This exhibit is a copy of Judge Brown's Opinion and Order in the First Action filed March 29, 2010.

he had with Henry and Moore in which they expressed concerns that they were not being treated fairly because of their race. (Keck Dep. 24:9-15, 33:21-36:11.) Keck specifically recounted Moore's complaints about Spina-Denson's conduct as his supervisor during the latter part of the Program. (Keck Dep. 33:21-36:11.) Additionally, Keck testified that he reassigned Ralph Peterson, the postmaster of Eugene, to another position in part because Peterson had not hired an African American during his tenure as postmaster. (Keck Dep. 45:3-23.) Moore also refers to portions of his own deposition and declaration offered in the First Action in which he describes his employment with the Post Office, his previous experience as a temporary supervisor, his unsuccessful attempts in the Program, and his participation in the roundtable meeting.

To the extent Moore is relying on evidence offered in support of the First Action as background material relevant to his current claims and which relates to his attempts to serve as a temporary, or 204B, supervisor, the evidence is admissible. In fact, Potter also refers to Moore's deposition from the First Action for this very purpose. However, Moore's reliance on other evidence obtained in the First Action as support for his claim that Moore discriminated or retaliated against him in July and August of 2008 is not appropriate. Judge Brown has clearly held that the evidence offered in support of the allegations set forth in the First Action was insufficient to establish *prima facie* claims for discrimination or retaliation.[5] Accordingly, both the court and the parties are bound by Judge Brown's ruling under the doctrine of issue preclusion and may not view the deposition transcripts as evidence that Post Office employees engaged in conduct involving Moore which could be characterized as discriminatory or retaliatory prior to Spring of 2007. The elements of issue preclusion, which bars the relitigation of issues that were actually decided in a previous action

---

[5]Moore appealed this ruling to the Ninth Circuit but recently withdrew that appeal.

involving the same parties, are met in this instance. The underlying issues are identical in both actions, was actually litigated by the parties in the First Action, and Judge Brown's ruling was a critical and necessary part of her dismissing the First Action. *See Clark v. Bear Stearns & Co., Inc.*, 966 F.2d 1318, 1320 (9th Cir. 1992)(setting forth the test for issue preclusion under federal law). In any event, the allegations set forth in the complaint currently before the court are limited to the Post Office's refusal to allow Moore to serve as a 204B supervisor and two or three incidents of discriminatory conduct, all of which occurred in July and August of 2008. Evidence of conduct which occurred prior to this two-month period with regard to Moore's unsuccessful attempts in the Program or the content of the roundtable meeting are not relevant to these issues and will not be considered as evidence of discriminatory or retaliatory conduct in this matter.

Finally, Moore relies on the deposition he took of Luther Johnson in this matter. In the deposition, Johnson describes his quest to be promoted to a supervisory or managerial position during his eighteen years as an employee of the Post Office. Johnson explained that he requested such a promotion at least once a year for eighteen years and attributed the denial of those requests to the fact that he is an African American. (Johnson Dep. 4:23-5:12, 7:8-25, 21:18-25.) He indicated that he was promoted to 204B supervisor within the first two or three years of his employment but then remained in that position for the next fifteen years while Caucasian employees with less seniority, experience, and education, including those that Johnson trained while serving as a 204B supervisor, were given the permanent supervisor positions. (Johnson Dep. 7:8-25, 9:16-23, 11:22-12:6, 21:18-25.) There is no evidence that Johnson ever complained to anyone about his concerns regarding the treatment of African Americans by the Post Office. Johnson also talked about a leadership skills bank ("Skills Bank") that was set up to provide basic information about the

pool of applicants at the Post Office and could be used by managers to obtain information about employees interested in a 204B supervisory position. (Johnson Dep. 18:11-19:6, 19:17-25.)

Johnson's testimony regarding his own struggles to become a permanent supervisor is not relevant to the matter before the court. There is no evidence that Johnson and Moore worked at the same location or were supervised by the same individuals. Additionally, Moore is complaining that Potter refused to consider him for a 204B supervisor position based on his status as an African American and his complaints of discrimination. Johnson, on the other hand, does not complain that he was not hired as a 204B supervisor because of his race. In fact, Johnson was promoted to 204B supervisor only two or three years after he was hired by the Post Office and worked in that capacity for fifteen years. Additionally, Johnson did not describe instances of discriminatory conduct in the workplace or complain to his supervisor about discrimination. Therefore, Johnson's testimony is not relevant to Moore's hostile environment or retaliation claim. In sum, the information that Johnson provides about the Skills Bank and the 204B supervisor hiring process is relevant to the facts currently before the court and will be considered.

*Background*

Moore began his employment with the Post Office as a "casual" employee at the airport in 1993. (Moore Dep. 142:23-143:10, May 7, 2009 ("First Moore Dep.").)[6] Six months later, the Post Office transferred Moore downtown as a transitional employee and, shortly thereafter, hired him as a permanent employee. (First Moore Dep. 143:11-25.) From 1996 through the present, Moore has worked various jobs, including flat sorter machine clerk, small parcel bundle sorter, express mail clerk, and automation letter clerk. (First Moore Dep. 144:20-148:16.)

---

[6]This deposition was taken with regard to, and offered as evidence in, the First Action.

In 2005, Sylvester Black, Vice President of the Western Region of the United States Postal Service, traveled to Portland, Oregon, to conduct a roundtable meeting to address allegations of race discrimination in the Post Office. (First Moore Dep. 50:13-53:20.) Moore attended the meeting and complained about the fact that he had submitted "a lot" of Form 13's[7] to his supervisors but had not been assigned to a 204B supervisory position. (First Moore Dep. 55:9-12.)

The 204B supervisory position offers an opportunity for nonsupervisory employees to serve temporarily as an acting supervisor and learn about basic management responsibilities, daily operations, and reporting structures. (Clifford Dec. ¶ 4.) 204B supervisors are used to cover staffing needs, such as the absence of a permanent supervisor due to scheduled days off or vacation time. (Clifford Decl. ¶ 4.) There is no formal procedure for applying for a 204B assignment. Typically, employees interested in working as a 204B supervisor alert their supervisor, either orally or in writing, of their interest. (Clifford Decl. ¶ 5.) The supervisors then assess the employee's fitness for the requested assignment as well as the current need for 204B supervisors. (Clifford Decl. ¶ 5.) The three main criteria used by Post Office managers to determine whether an employee should be considered for a management position are attendance record, discipline record, and attitude. (Lorenz Decl. Ex. D at 1; Santora Dep. 9:18-10:2; Chamberlin Dep. 66:11-15.) A Post Office supervisor stated there are many opportunities to serve as a 204B supervisor and once an employee expresses an interest in a 204B assignment, they are generally allowed to do so unless they have a poor attendance record or disciplinary issues. (Kersey Dep. 34:23-35:8.) While serving as 204B supervisors, employees are entitled to a higher rate of pay. (Moore Decl. ¶ 4.)

---

[7]Form 13 is a form used by the Post Office since at least 1976 through which an employee can make requests, such as time off or overtime, or express an interest in a 204B position. (Santoro Dep. 8:3-23.)

I.  Discrimination

   *A.  Failure to Promote*

Shortly after the roundtable meeting, the Post Office created the Skills Bank which allowed employees to input their resume and basic application information into a web-based central clearinghouse available to all Post Office managers and employers.  (Moore Dep. 26:23-27:17, February 9, 2010 ("Second Moore Dep."); Johnson Dep. 18:11-19:6; Clifford Decl. ¶ 6.)  The Skills Bank allowed employees to express an interest in accepting opportunities in specified assignment areas or to express a geographical preference within the Post Office.  (Clifford Dec. ¶ 6.)

The Skills Bank is not a formal application process – it is merely a database that managers can use to identify individuals who have expressed an interest in learning other skills.  (Clifford Dec. ¶ 7.)  Moore, however, represents that he understood that the creation of the Skills Bank eliminated the need to complete a Form 13 to express an interest in a 204B assignment.  (Second Moore Dep. 31:9-32:15.)  Moore testified that he thought once he placed his information into the Skills Bank indicating he had experience as a 204B supervisor and was interested in new 204B supervisor opportunities in processing and distribution, managers became obligated to consider him for 204B supervisor openings in that area.  (Second Moore Dep. 26:23-27:17, 28:7-11.)  Johnson explained that in his experience, even after the Skills Bank was created, an employee interested in a 204B supervisory position would still have to fill out a Form 13 indicating they were interested in the position and provide it to a manager.  The manager would then advise the employee to "get it set up" in the Skills Bank.  (Johnson Dep. 19:17-25.)  Other Post Office employees, including one who served as a union shop steward, understood there were several appropriate methods for an employee to communicate a desire to serve as a 204B supervisor:  indicating such an interest in the Skills

Bank; orally communicating an interest to a supervisor; or completing a Form 13 indicating you are interested in 204B assignment. (Morton-Hamlet Dep. ¶ 8; Santoro Dep. 8:3-9:9; Marc Kersey Dep. 34:13-35:15.) At least one Post Office supervisor has never filled a 204B assignment solely from information in the Skills Bank, despite acknowledging that indicating an interest in a 204B assignment in the Skills Bank is one way for an employee to express an interest in such an assignment. (Santoro Dep. 46:13-24, 47:17-25.)

Moore entered his information in the Skills Bank sometime in 2005 or 2006. (Second Moore Dep. 33:16-19.) In late Fall of 2006, Moore was given his first assignment as a 204B supervisor after he made an oral request to a manager that he be allowed to work as a 204B supervisor to increase his chances to successfully complete the Program. (First Moore Dep. 33:16-19.) Moore served as a 204B supervisor in the Creston station for three or four weeks and was then reassigned to Cherry Blossom to work as a 204B closing supervisor. (First Moore Dep. 41:21-42:8, 43:21-24.) Prior to the filing of this action, Moore last updated his information in the Skills Bank in April 2007. (Second Moore Dep. 33:20-24.) Currently, the Skills Bank shows that Moore is interested in a 204B assignment in either distribution operations or customer service. (Oberlin Decl. Ex. 14 at 3.)

Moore alleges that during the months of July and August of 2008, "Chamberlin, Anderson, Goold, and Kersey all denied Plaintiff the opportunity for advancement by not allowing him the chance to train in the position of a supervisor" while allowing three male employees, who were not African American and had less seniority or sick leave than Moore, to act as 204B supervisors during this same time period. (Compl. ¶ 7.) In his deposition, Moore expanded on these allegations by explaining that he believes the United States Postal Service, as a whole, has a policy of denying African Americans an equal opportunity for advancement in the postal service and that Kim

Anderson, Jeanie Goold, Reba Kersey, Tim Chamberlin, and Robert McVicker were acting to further this policy by failing to assign him to a 204B supervisory position in the summer of 2008. (Second Moore Dep. 19:15-24:14, 69:19-23.) Moore described Anderson, Goold, and Chamberlin as "puppet[s] in the game." (Second Moore Dep. 21:12-22:15, 64:13-65:23.)

The evidence establishes that Nathan Clayton, Edmond Batisan, and Bernard Gallardo worked as 204B supervisors in July and/or August of 2008. None of these individuals were African American. (Second Moore Dep. 34:19-23; Lorenz Decl. Ex. C at 4-5.) Moore does not know how these individuals conveyed an interest in a 204B assignment to their supervisors but believes they were required to be in the Skills Bank before being considered for a 204B assignment. (Second Moore Dep. 34:24-35:25.) Kersey, who was involved in the assignment of at least two of these employees to 204B supervisor positions, was advised by other Post Office employees that Batisan and Gallargo were interested in a 204B assignment. (Kersey Dep. 38:18-39:4, 47:15-25.) Kersey testified at her deposition that Moore never expressed a desire to serve as a 204B supervisor to her in any way, shape, or form, and that she did not get that information from anyone else. (Kersey Dep. 37:6-19, 72:6-9.)

Moore admits he did not make any written or oral requests to be considered for 204B supervisor openings in the summer of 2008 but, instead, relied solely on the information he inputted into the Skills Bank to alert supervisors to his desire to work as a 204B supervisor during these two months. (Second Moore Dep. 28:2-6.) According to a coworker, it was common knowledge in the summer of 2008 that Moore was interested in serving as a 204B supervisor. (Morton-Hamlet Decl. ¶ 7.) When this coworker questioned McVicker about why Moore was not allowed to work as a 204B supervisor in the summer of 2008, she was told that Moore would never be a 204B supervisor

because he did not have the right attitude.  (Morton-Hamlet Decl. ¶7.)

As of the date of his second deposition, Moore was again serving as a 204B supervisor. (Second Dep. 37:17-20.)  When Moore was faced with the task of finding someone to work as a 204B supervisor on a weekend shift, he did not use the Skills Bank but rather approached individuals whom he knew had prior experience as a 204B supervisor.  (Moore Dep. 38:1-24.)  Moore is unaware of any Post Office employee who was given the opportunity to serve as a 204B supervisor based solely on information from the Skills Bank.  (Second Moore Dep. 28:12-29:1.)

*B.  Hostile Environment*

In his deposition, Moore represented that in the summer of 2008, Chamberlin assigned Moore, along with three other African Americans, to work on the low-cost tray sorter, which Moore described as a task that was not part of the regular job duties of a clerk and was less desirable and more physically demanding.  (Moore Dec. ¶ 6.)[8]  During this same period, Chamberlin also harassed Moore for having personal items, such as a water bottle and sweater, on the workroom floor while allowing various Caucasian employees to eat bananas, cookies, and pretzels on the workroom floor and have water on the flat sorter machine, or have a sweater or sweatshirt on the workroom floor and store it in a tub placed by the printer.  (Moore Dec. ¶ 5, 7-8.)  Both McVicker and Chamberlin reprimanded Moore, as well as other African Americans, for talking on the workroom floor while allowing employees who were not African American to engage in conversations.  (Compl. ¶ 7; Second Moore Dep. 52:22-53:19; Moore Dec. ¶ 13.)  On one occasion, Moore referred to McVicker as a "racist" after being reprimanded for talking.  (Moore Dec. ¶ 13; Chamberlin Dep. 54:24-55:25.)

---

[8]This statement appears to conflict with his testimony that since January 2008, he has worked as a flats sorter machine operator.  (Second Moore Dep. 7:7-12.)

Moore admitted that while he had "a problem" with Chamberlin's comments and that they made working for him difficult, they did not affect his ability to do his job. (Second Moore Dep. 52:10-21, 57:1-9.)

II. Retaliation

Moore also believes that Anderson, Goold, Kersey, Chamberlin, and McVicker engaged in retaliatory conduct against him for filing a discrimination complaint in July 2007 and the First Action in August 2008. (Second Moore Dep. 73:12-73:1) He believes there are no secrets in the Post Office and that if management knows that a complaint has been filed, "they want to get rid of the so-called troublemaker." (Second Moore Dep. 72:19-73:1.) There is no evidence in the record that any of the individuals alleged to have engaged in retaliatory acts were aware in July or August of 2008 of Moore's filing the 2007 internal complaint or the First Action.

*Legal Standard*

Summary judgment is appropriate only when the record shows that "there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c)(2). A dispute is genuine if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A fact is material if, under the substantive law of the case, resolution of the factual dispute could affect the outcome of the case. *Id.* at 248. The moving party bears the initial burden of showing "the absence of a genuine issue concerning any material fact." *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 159 (1970). The moving party satisfies its burden by offering the district court the portions of the record it believes demonstrate the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The court does "not weigh the evidence or determine the truth

of the matter, but only determines whether there is a genuine issue for trial." *Balint v. Carson City, Nev.*, 180 F.3d 1047, 1054 (9th Cir. 1999).

Once the moving party meets its initial burden, the nonmoving party must establish the existence of a genuine issue of material fact. FED. R. CIV. P. 56(e). To meet this burden, the nonmoving party must make an adequate showing as to each element of the claim for which it will bear the burden of proof at trial. *Celotex*, 422 U.S. at 322-23. The nonmoving party "may not rest upon the mere allegations or denials of his pleading but . . . must set forth specific facts showing that there is a genuine issue for trial." *First Nat'l Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 288-89 (1968)(*citing* FED. R. CIV. P. 56(e)). In order to establish that there is a genuine issue of material fact, the nonmoving party "need only present evidence from which a jury might return a verdict in [the nonmoving party's] favor." *Anderson*, 477 U.S. at 257. The evidence set forth must be sufficient to allow a rational jury to find for the nonmoving party. *Matsushita Elec. Indus. Co. Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). "The mere existence of a scintilla of evidence in support of the [nonmoving party's] position [is] insufficient." *Anderson*, 477 U.S. at 252. Additionally, the court must view the evidence in the light most favorable to the nonmoving party, and must draw all reasonable inferences from the underlying facts in favor of the nonmoving party. *Bell v. Cameron Meadows Land Co.*, 669 F.2d 1278, 1284 (9th Cir. 1982).

The Ninth Circuit has cautioned against too readily granting summary judgment in employee discrimination cases because of "the importance of zealously guarding an employee's right to a full trial, since discrimination claims are frequently difficult to prove without a full airing of the evidence and an opportunity to evaluate the credibility of the witnesses." *McGinest v. GTE Serv. Corp.*, 360 F.3d 1103, 1112 (9th Cir. 2004); *see also Oncale v. Sundowner Offshore Serv., Inc.*, 523 U.S. 75,

81-82 ("The real social impact of workplace behavior often depends on a constellation of surrounding circumstances, exceptions, and relationships which are not fully captured by a simple recitation of the words used or the physical acts performed.").  Thus, the Ninth Circuit has set "a high standard for granting summary judgment in employment discrimination cases." *Schnidrig v. Columbia Mach., Inc.*, 80 F.3d 1406, 1410 (9th Cir. 1996).  Courts require "very little evidence to survive summary judgment in a discrimination case, because the ultimate question is one that can be resolved only through a searching inquiry–one that is more appropriately conducted by the factfinder upon a full record."  *Id.*  (internal quotations and citation omitted).  Additionally, "any indication of discriminatory motive . . . may suffice to raise a question that can only be resolved by a factfinder," and thus "summary judgment for the defendant will ordinarily not be appropriate on any ground relating to the merits."  *Id.* (*quoting Warren v. City of Carlsbad*, 58 F.3d 439, 443 (9th Cir. 1995)).

Nevertheless, the Ninth Circuit holds that the "[f]ailure to allege 'specific facts' that establish the existence of a prima facie case renders a grant of summary judgment appropriate."  *Jurado v. Eleven-Fifty Corp.*, 813 F.2d 1406, 1409 (9th Cir. 1987) (citation omitted).  Additionally, "when evidence to refute the defendant's legitimate explanation is totally lacking, summary judgment is appropriate even though plaintiff may have established a minimum prima facie case."  *Wallis v. J.R. Simplot Co.*, 26 F.3d 885, 890-91 (9th Cir. 1994).

*Discussion*

I.  Discrimination

Moore asserts that Potter discriminated against him based on his African American heritage. The alleged discriminatory conduct includes both a failure to promote Moore to a 204B supervisor

position as well as instances of workplace harassment creating a hostile environment.

Under federal law, a plaintiff establishes a *prima facie* case of discrimination by offering evidence that "give[s] rise to an inference of unlawful discrimination." *Godwin v. Hunt Wesson, Inc.* 150 F.3d 1217, 1220 (9th Cir. 1998) (*quoting Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981). A plaintiff can meet this burden by showing that he has been singled out and treated less favorably than others similarly situated because of a protected class status. *See McGinest*, 360 F.3d at 1121 (applying standard in race discrimination case).

A plaintiff can establish a *prima facie* case of discrimination in one of two ways. First, a plaintiff could present direct evidence of discriminatory intent. *Wallis v. J.R. Simplot, Co,*, 26 F.3d at 889. "Direct evidence is 'evidence which, if believed, proves the fact of discriminatory animus without inference or presumption.'" *Vasquez v. Los Angeles,* 349 F.3d 634, 640 (9th Cir. 2003) (*quoting Godwin v. Hunt Wesson, Inc.*, 150 F.3d 1217, 1221 (9th Cir. 1998)). Second, a plaintiff alternatively could present circumstantial evidence of discrimination by establishing: (1) membership in a protected class, (2) performance which meets the employer's legitimate expectations, (3) an adverse employment action, and (4) the more favorable treatment of other employees with similar qualifications. *Godwin*, 150 F.3d at 1220 (*citing McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973)).

When a plaintiff is alleging discrimination based on the creation and maintenance of a hostile environment, the existence of an adverse employment action gives way to the existence of an intimidating and offensive work environment. Under Title VII, "[a] 'hostile work environment' occurs when there is a pattern of ongoing and persistent harassment severe enough to alter the conditions of employment." *Draper v. Coeur Rochester, Inc.*, 147 F.3d 1104, 1108 (9th Cir.

1998)(*citing Meritor Sav. Bank v. Vinson*, 477 U.S. 57, 66-67 (1986)). Title VII's prohibition on discrimination encompasses "discriminatory intimidation, ridicule and insult" that alters the conditions of the victim's employment and creates an abusive working environment. *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993). The standard is both subjective and objective: the victim must perceive the environment as abusive, and the environment must be one that a reasonable person would find hostile or abusive. *Id.* Title VII does not prohibit all verbal or physical harassment in the workplace. *Oncale*, 523 U.S. at 80.

To support a claim of harassment, conduct directed at the plaintiff must be both discriminatory and pervasive. Determining the type of conduct that constitutes a hostile work environment requires:

> careful consideration of the social context in which particular behavior occurs and is experienced by its target ... [and it] often depends on a constellation of surrounding circumstances, expectations, and relationships which are not fully captured by a simple recitation of the words used or the physical acts performed.

*Draper*, 147 F.3d at 1109 (*citing Oncale*, 523 U.S. at 81). "Conduct that is not severe or pervasive enough to create an objectively hostile or abusive work environment – an environment that a reasonable person would find hostile or abusive – is beyond Title VII's purview." *Oncale*, 523 U.S. at 81 (*quoting Harris*, 510 U.S. at 21). *See also Candelore v. Clark County Sanitation Dist.*, 975 F.2d 588, 590 (9th Cir. 1992)(isolated incidents of sexual horseplay or inappropriate behavior over a period of years not so egregious as to render work environment hostile); *Benitez v. Portland General Elec.*, 799 F. Supp. 1075, 1080-81 (D. Or. 1992)("Isolated comments or sporadic incidents of harassment, without more, will not support a hostile environment claim.").

If a hostile working environment is found to exist, an employer will be held liable for failing

to take adequate remedial measures to remedy harassment of which it knew or should have known. "These measures must include immediate and corrective action reasonably calculated 1) to end the current harassment, and 2) to deter future harassment from the same offender or others." *Yamaguchi v. U.S. Dept. of the Air Force*, 109 F.3d 1475, 1483 (9th Cir. 1997) (citations omitted). "The adequacy of the employer's response depends on the seriousness of the sexual harassment." *Id.* (*citing Ellison v. Brady*, 924 F.2d 872, 882 (9th Cir. 1991)).

### A. Failure to Promote

To establish a *prima facie* case specifically for failure to promote due to racial discrimination, a plaintiff must demonstrate that: (1) he is a member of a protected class; (2) he applied for and was qualified for an open job; (3) he was rejected for that job; and (4) rather than filling the position the employer left it open or filled it with a Caucasian worker. *McGinest*, 360 F.3d at 1122-1123. Potter concedes the first and fourth elements – that Moore is a member of a protected class and that 204B positions were available during the months in question or were filled by individuals who were not African American. Potter argues that Moore is unable to support a *prima facie* claim for discrimination based on a failure to promote because he is unable to establish that he ever applied for, or even expressed an interest in, a 204B assignment in July and August of 2008, and that based on the failure to apply, Moore was not rejected for the 204B assignment. Moore contends that once the Skills Bank was created in 2006, all an employee needed to do to be considered for a 204B assignment was express an interest through the Skills Bank.

The evidence establishes that after 2006, a Post Office employee could communicate a desire to serve as a 204B supervisor in three ways: 1) express an interest in a 204B assignment in the Skills Bank; 2) orally advise a supervisor of an interest in a 204B assignment; or 3) indicate an interest in

a 204B assignment on a Form 13 and give the form to a supervisor. However, most supervisors, including Moore, did not use the Skills Bank to determine which employees were interested in a 204B supervisor position. In fact, there is no evidence that any supervisor filled a 204B position with information obtained solely from the Skills Bank.

Moore completed his profile in the Skills Bank in late 2005 or early 2006. He was not offered a 204B assignment until the Fall of 2006, after he orally advised a supervisor he was interested in the position to gain experience which he thought would increase his success in the Program. This is evidence that as of Fall 2006, Moore realized orally informing a supervisor of his interest in a 204B assignment produced results while merely indicating his interest in such an assignment in the Skills Bank did not. Subsequently, when Moore was required to fill a 204B supervisor position in 2009, he did not use the Skills Bank to determine who was interested in the position. Rather, he approached employees whom he knew had prior experience as a 204B supervisor to see if they were interested in working in that capacity to cover his weekend shift.

This evidence contradicts Moore's statement that he thought once an employee placed their information into the Skills Bank indicating they had experience as a 204B supervisor and were interested in new 204B supervisor opportunities, management became obligated to consider the employee for 204B supervisor openings. To the contrary, the evidence supports Potter's representation that the Skills Bank was not part of a formal application process and that the Post Office's procedure for filling 204B assignments during the period in question required the employee to take affirmative steps to make his desire for a 204B assignment known to a supervisor. In fact, at least two of the three individuals working as 204B supervisors in July and August of 2008, orally indicated to Kersey through other employees that they were interested in working as a 204B

supervisor. While there is no evidence establishing how the third employee communicated his interest in a 204B assignment, the absence of evidence that any supervisor ever hired a 204B supervisor exclusively based on information from the Skills Bank leaves unsupported Moore's allegation that he could solely rely on the Skills Bank to secure a 204B position.

Moore admits he did not make any written or oral request to be considered for 204B supervisor openings in the summer of 2008. Kersey, the supervisor who placed at least two of the three individuals in 204B supervisor positions during this period, testified Moore never expressed a desire to serve as a 204B supervisor to her in any way, shape or form, and that she didn't get the information from anyone else. While Moore presents evidence through the testimony of a coworker that everyone knew Moore wanted to work as 204B supervisor, there is no evidence that any supervisor or manager with the authority to hire 204B supervisors was aware of Moore's interest. Additionally, based on the copy of Moore's profile printed from the Skills Bank in June 2010, the last time a manager or supervisor reviewed this information was October 27, 2006, six months before Moore last updated his information in the Skills Bank and more than a year and a half prior to his interest in the 204B assignment in July and August of 2008. On the evidence before the court, none of Moore's supervisors in July and August of 2008 were aware of Moore's interest in a 204B assignment during that period through information obtained from the Skills Bank.

The evidence clearly establishes that Moore was aware of the procedures utilized by the Post Office to express an interest in a 204B assignment. He knew from his personal experience in 2006 where he was able to obtain a 204B assignment only after orally requesting such assignment from a supervisor, and from the procedure he himself utilized to hire a 204B supervisor in 2009. Moore failed to follow these procedures in July and August of 2008, and instead relied solely on the

information in the Skills Bank, a source not used by any supervisor, including Moore.  Accordingly, Moore has failed to establish that he applied for a 204B assignment during that period and, because the Post Office was not aware of Moore's interest in a 204B assignment, it did not reject Moore's application for the assignment.  Thus, the court finds that Moore is unable to establish the second and third elements of a *prima facie* case for discrimination based on a failure to promote and that Potter is entitled to summary judgment on this claim.

### B.  Hostile Environment

In support of his hostile environment claim, Moore relies on Chamberlin's assignment of Moore and three other African Americans to the low-cost tray sorter, a less desirable and more physically demanding work assignment; Chamberlin's harassment of Moore for having a water bottle and sweater on the workroom floor while allowing Caucasians to have similar items on the workroom floor; and Chamberlin and McVicker's disciplining of Moore and other African Americans for talking on the workroom floor, all of which occurred in July and August of 2008. Potter argues that these incidents are properly characterized as "occasional, isolated, sporadic, or trivial" and are "not severe enough to create a hostile environment or to alter the conditions of Moore's employment."  (Mem. of Law in Supp. of Defs.' Mot. for Summ. J. At 14.)  The court agrees.

Moore asserts that he and three other African Americans were assigned to work the low-cost tray sorter sometime in July and August of 2008.  There is no evidence of how long the assignment lasted, the comparative number of African Americans to Caucasians who were assigned to the low-cost tray sorter, or whether Caucasian employees were ever – or never – assigned to the same task. The mere fact that four African Americans were assigned to this less desirable position at some point

during a two-month period is not evidence of discrimination-based harassment.

The fact that African Americans, including Moore, were not allowed to have work bottles or sweaters on the workroom floor or engage in conversations with each other during a two-month period is also insufficient to establish that Moore was subjected to conduct that was severe or pervasive enough the create an objectively hostile or abusive work environment. First, there is no evidence regarding the pervasiveness of the alleged discriminatory conduct. In his declaration, Moore states that Chamberlin insisted that he leave his sweater in his locker if he was not wearing it and reprimanded him for having a water bottle on the workroom floor in July and August 2008. The conduct was clearly limited to a two-month period and the number of times Moore was harassed for personal items on the workroom floor during these two months is not indicated. Clearly, two comments during a two-month period would not be pervasive. On the other hand, Moore stated in his declaration that McVicker repeatedly reprimanded him for talking on the workroom floor during the summer of 2008. The term "repeatedly" implies numerous reprimands but, again, there is no clear indication of how many times Moore was reprimanded. In any event, the allegedly harassing behavior was not objectively severe. Moore's supervisors were directing his conduct at work, which was something they were authorized and obligated to do, and Moore has presented no evidence that they did so using negative racial comments in directing Moore's work. The requirement that Moore not bring personal items on the workroom floor and to refrain from engaging in conversations with coworkers while on the workroom floor is neither hostile nor abusive. In sum, under controlling precedent, the conduct which Moore asserts as racial harassment was not sufficiently pervasive or severe to create an objectively hostile or abusive work environment.

With regard to the subjective element of the test, Moore admits the alleged harassment did

not affect his ability to do his job but rather only made it difficult to work for Chamberlin. The evidence supports this statement: Moore continued to engage in all activities, completed his work assignments successfully, and did not report any of the alleged discriminatory conduct to his supervisors. Mere discomfort or inconvenience resulting from harassment in the workplace is not sufficient to create a hostile work environment. *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998)(conduct must be extreme to change terms and conditions of employment sufficiently to support hostile environment claim). Accordingly, Moore has failed to establish that the alleged harassment created a subjectively hostile or abusive environment.

The evidence presented establishes that, at the most, Moore experienced behavior in working for Chamberlin and McVicker in July and August of 2008 that, while rude and annoying, does not meet the standard of severe or pervasive. Accordingly, Potter is entitled to summary judgment on this claim.

II. Retaliation

In support of his Second Claim for Relief for retaliation under Title VII, Moore alleges that the Post Office's failure to assign him to a 204B supervisor position, and Chamberlin and McVicker's harassment, all of which occurred in July and August of 2008, were intentional acts of retaliation against Moore based on his filing in internal discrimination complaint on July 11, 2007, and filing the First Action on August 27, 2008. Title VII provides, in relevant part: "It shall be an unlawful employment practice for an employer to discriminate against any of his employees or applicants for employment . . . because he has opposed any practice made an unlawful employment practice by this title, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this title." 42 U.S.C. § 2000e-3(a) (2007).

This provision "protects the right to be free from certain types of forbidden discrimination, as well as the right to speak out against such discrimination. It also protects against retaliation for the exercise of the right to speak out against discrimination." *Hernandez v. Spacelabs Med. Inc.*, 343 F.3d 1107, 1113 (9th Cir. 2003).

"A plaintiff may establish a *prima facie* case of discriminatory retaliation by showing that: (1) she engaged in a protected activity; (2) she was subjected to an adverse employment action; and (3) there was a causal link between the protected activity and the adverse employment action." *Jamal v. Wilshire Mgmt. Leasing Corp.*, 320 F. Supp. 2d 1060, 1078 (D. Or. 2004) (*citing Bergene v. Salt River Project Agric. Improvement & Power Dist.*, 272 F.3d 1136, 1141 (9th Cir. 2001)). Causation may be "inferred from circumstantial evidence, such as the employer's knowledge that the plaintiff engaged in protected activities and the proximity in time between the protected action and the allegedly retaliatory activity." *Knox v. City of Portland*, 543 F. Supp. 2d 1238, 1248 (D. Or. 2008)(*citing Yartzoff v. Thomas*, 809 F. 2d 1371, 1376 (9th Cir. 1987)). "Temporal proximity between protected activity and an adverse employment action can by itself constitute sufficient circumstantial evidence of retaliation in some cases. However, the timing must be very close." *Adams v. Home Depot USA, Inc.*, No. 05-CV-1798-ST, 2007 WL 4565163, at *26 (D. Or. Dec. 19, 2007)(internal citations omitted). It bears noting that "[e]ssential to a causal link is evidence that the employer was aware that the plaintiff had engaged in the protected activity." *Dameworth v. Linn-Benton Community College*, Civ. No. 07-6162, 2007 WL 2816216, at *6 (D. Or. Sept. 27, 2007)(*quoting Cohen v. Fred Meyer, Inc.*, 686 F.2d 793, 796 (9th Cir. 1982)). *See also Lawson v. Walgreen Co.*, No. CV. 07-1884-AC, 2009 WL 742680, at *12 (D. Or. March 20, 2009).

At the outset, the court notes that the First Action was filed on August 27, 2008. All of the

alleged retaliation occurred before the First Action was filed. The record does not establish that any retaliatory acts occurred during the relevant four day period between August 27, 2008, and August 31, 2008. Accordingly, Moore is unable to base his retaliation claim on the filing of the First Action.

With regard to the internal complaint filed on July 7, 2007, the temporal proximity between the acts of protected conduct and the alleged retaliatory acts alone is not sufficient to establish causation. Nearly a year passed between the filing of the internal complaint and the first act of alleged retaliation in July 2008, which is too large of a gap to establish an inference of retaliation. *See Cornwell v. Electra Cent. Credit Union*, 439 F.3d 1018, 1035 (9th Cir. 2006)(gap of eight months, from November 2001 to July 2002, too great to support an inference that the protected activity caused the adverse employment action); *Coons v. Secretary of U.S. Dept. of Treasury*, 383 F.3d 879, 887 (9th Cir. 2004)(passage of a full year inadequate to show causal link between protected activity and adverse employment decision).

Additionally, there is no evidence that any of Moore's supervisors knew he filed either the internal complaint or the First Action. Moore's sole evidence that his supervisor were aware of his protected activity in 2007 and 2008 is a statement made by Santoro that McVicker indicated to him that Moore filed an internal complaint in 2004 or 2005. In the absence of evidence that the individuals engaged in the retaliatory conduct were aware of the protected conduct in July or August of 2008, Moore is unable to establish the required causal link. *See Noga v. Costco Wholesale Corp.*, 583 F. Supp. 2d 1245, 1263 (D. Or. 2008)(To establish the required causal connection for a retaliation claim, a plaintiff must show that the individual alleged to have engaged in retaliatory conduct was aware of the protected activity at that time.). Potter is entitled to summary judgment on Moore's claim for retaliation.

*Conclusion*

Potter's motion (#17) for summary judgment is GRANTED.

DATED this 8th day of October, 2010.

_____/s/ John V. Acosta_____
JOHN V. ACOSTA
United States Magistrate Judge